1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

JOHN MERRELL,

11                            Plaintiff,

12            v.                                        CASE NO. C06-404JLR

13   NOREEN RENIER,                                     ORDER

14                            Defendant.

15

16                                    **I.  INTRODUCTION**

17         This matter comes before the court on two motions from Plaintiff John Merrell.

18   The first is a motion for summary judgment (Dkt. # 23); the second is a motion to compel

19   Defendant Noreen Renier to appear for a deposition (Dkt. # 28).  Ms. Renier has cross-

20   moved for summary judgment.  Although Ms. Renier has requested oral argument on the

21   summary judgment motions, the court finds these motions appropriate for disposition on

22   the basis of the parties' briefing and supporting evidence.  For the reasons stated below,

23   the court GRANTS Mr. Merrell's summary judgment motion in part and DENIES it in

24   part, GRANTS Ms. Renier's cross-motion in part and DENIES it in part, and DENIES

25   Mr. Merrell's discovery motion.

26

27

28   ORDER – 1

## II.  BACKGROUND

Ms. Renier is a psychic; Mr. Merrell is a skeptic.  Although the existence and scope of Ms. Renier's paranormal abilities are beyond the court's purview, there is no dispute that she has at least attempted to use her abilities to assist law enforcement agencies.  While she was living in Oregon in 1985, a local newspaper wrote an article about her pursuits.  The article captured the attention of Mr. Merrell, who sent a letter to at least one newspaper detailing his reasons for believing Ms. Renier to be a charlatan. Mr. Merrell sent the letter as a representative of the "Northwest Skeptics Organization."

Ms. Renier sued Mr. Merrell in Oregon state court, alleging that his letter defamed her.  She won a $25,000 jury verdict.  A cross-country odyssey of judgment enforcement proceedings and other litigation ensued, terminating in a 1992 Florida lawsuit that Mr. Merrell brought against Ms. Renier.[1]  The parties settled the Florida suit and their prior disputes in a written agreement ("Settlement Agreement" or "SA").

This action arises from Ms. Renier's alleged breach of the Settlement Agreement, which provides as follows:

> That JOHN MERRELL and NOREEN RENIER, directly or indirectly, will cease and desist from engaging in any form of conduct which attempts in any way to diminish and/or disparage the other's reputation, personally, professionally and/or occupationally, including but not limited to contacts with each other, their family, loved ones, business associates, potential business associates, clients, and within their own peer group and any news organizations or media of any type.

SA at 2.  The Settlement Agreement also contains a confidentiality clause:

> JOHN MERRELL and NOREEN RENIER agree that the terms of this Settlement Agreement shall be and will always remain confidential.  There will be no contact with anyone including any type of media announcing that the litigation is concluded or that a settlement is reached in any way.

Id.

---

[1]The record does not reveal what claims Mr. Merrell brought in the Florida litigation.

ORDER – 2

The parties agreed that they would not "file any new lawsuits against each other or their families," but they reserved "the right to seek enforcement of [the Settlement Agreement] in the event of its breach."  Id.  They agreed that the breaching party would pay the non-breaching party's attorneys' fees.  Id.

In 2005, Ms. Renier and co-author Naomi Lucks published A Mind for Murder, a book that chronicled Ms. Renier's career.  Ms. Renier devoted two chapters of the book to describing Mr. Merrell's allegations against her and her victory in the Oregon trial.  Her account of the events did not flatter Mr. Merrell.  She accused him of lying in his 1985 letter to the newspaper, and of repeating the lies at trial.  E.g., A Mind for Murder at 207 ("Merrell was trying to destroy my career and psychic reputation – my life – with his lies."); id. at 214 ("It was hell to sit there and listen to Merrell lie about me to a judge and jury."); id. at 215 ("The hard part was sitting there listening to Merrell lie about me.").

In addition, Mr. Merrell alleges that Ms. Renier published, on websites under her control, an article that a third party wrote about Gary Posner, another skeptic.  One portion of the Posner article contains a brief summary of the Oregon defamation trial, and accuses Mr. Merrell of "malicious lies and half-truths."[2]  Mr. Merrell alleges that Ms. Renier first published the article in 1998 and that it remained available on websites under her control until July 2006.

In September 2005, Mr. Merrell sent a letter to the company that published A Mind for Murder.  He included a copy of the Settlement Agreement, and alleged that Ms. Renier had breached it by writing the book.

---

[2]Mr. Merrell did not attach a paper copy of the Posner article in his declaration, instead relying on a compact disc that he submitted to the court.  The portion of the article that mentions Mr. Merrell is found in the "skeptic3.html" file on that disc.

ORDER – 3

In December 2005, Mr. Merrell, by then a Washington resident, brought this action in Snohomish County Superior Court against Ms. Renier, Ms. Lucks, the company that published A Mind for Murder, one of the company's subsidiaries, and an editor who worked for the publishing company. The state court dismissed the claims against all Defendants except Ms. Renier. Ms. Renier, who lives in Virginia, removed the action, invoking this court's diversity jurisdiction.

Mr. Merrell claims that Ms. Renier breached the Settlement Agreement by writing A Mind for Murder and by publishing the Posner article on her websites. He also seeks the equitable remedy of disgorgement of Ms. Renier's profits from A Mind for Murder.[3]

Ms. Renier has three counterclaims. She claims that Mr. Merrell breached the confidentiality clause in the Settlement Agreement by divulging the agreement to her publisher. She also alleges that her publisher stopped printing A Mind for Murder as a result of Mr. Merrell's communications. On that basis, she claims that Mr. Merrell tortiously interfered with her publishing contract and with business expectancies associated with the ongoing publication of A Mind For Murder.

Mr. Merrell seeks summary judgment on his breach of contract claim and against Ms. Renier's counterclaims. In her response, Ms. Renier seeks summary judgment in her favor on Mr. Merrell's contract claim.

## III. ANALYSIS

On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is

---

[3]Ms. Renier mistakenly contends that Mr. Merrell failed to plead any claim for equitable relief. Mr. Merrell plainly requested disgorgement of Ms. Renier's profits in his complaint and amended complaint. This is sufficient, under the liberal pleading regime of Fed. R. Civ. P. 8, to stake an equitable claim to the profits.

ORDER – 4

appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. <u>Matsushita Elect. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991). When confronted with purely legal questions, the court does not defer to the non-moving party.

**A.     Ms. Renier Breached the Settlement Agreement.**

**1.     Choice of Law**

To decide whether publication of <u>A Mind for Murder</u> breaches the Settlement Agreement, the court must first interpret the agreement. The threshold question is which state's body of contract law applies. Mr. Merrell was not a Washington resident when he entered the Settlement Agreement; and it appears that Ms. Renier has never been a Washington resident. Neither party addresses the choice-of-law question inherent in this action, although both parties rely exclusively on Washington authority in their briefs. The Settlement Agreement is silent as to the law governing its interpretation. Under these circumstances, the court must apply Washington contract law. <u>See</u> <u>Patton v. Cox</u>, 276 F.3d 493, 495 (9th Cir. 2002) ("When a federal court sits in diversity, it must look to the forum state's choice of law rules to determine the controlling substantive law."); <u>see also</u> <u>Burnside v. Simpson Paper Co.</u>, 864 P.2d 937, 940 (Wash. 1994) (noting that where a party does not address choice-of-law issues, a Washington court presumptively applies Washington law).

ORDER – 5

### 2. Interpreting the Settlement Agreement

In Washington, contract interpretation is a question of law.  Tanner Elec. Coop. v. Puget Sound Power & Light, 911 P.2d 1301, 1310 (Wash. 1996).  Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic evidence admits more than one "reasonable inference," the court must consider that evidence.  Id.  These limitations, which arose from the decision in Berg v. Hudesman, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation.  Hearst Comms., Inc. v. Seattle Times Co., 115 P.3d 262, 266 (Wash. 2005).  In Hearst, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'"  Id. at 267 (quoting Hollis v. Garwall, Inc., 974 P.2d 836, 843 (Wash. 1999)) (emphasis in Hearst). Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent."  Id. (directing courts to interpret "what was written" rather than "what was intended to be written").

Interpreting the Settlement Agreement based solely on its text, Ms. Renier unquestionably breached it by publishing A Mind for Murder and publishing the Posner article on her websites.  The parties used the agreement to express their intent to "no longer be involved in each other's lives in any way . . . ."  SA at 1.  Consistent with that intent, they entered a broad agreement barring them from "directly or indirectly . . . engaging in any form of conduct which attempts in any way to diminish and/or disparage the other's reputation, personally, professionally, and/or occupationally."  SA at 2. Under the broad terms of the Agreement, there is no question that the statements in A Mind for Murder and the Posner article that accuse Mr. Merrell of lying and maliciously

ORDER – 6

attempting to destroy Ms. Renier's career are at least capable of diminishing or disparaging Mr. Merrell's reputation.

The court rejects Ms. Renier's claim that she did not breach the Settlement Agreement because her statements in <u>A Mind for Murder</u> are, according to her, true.  The agreement itself makes no reference to truth or falsity.  Instead, it prohibits any attempt to "diminish" or "disparage" either party's reputation.  Putting aside the meaning of "disparage,"[4] there is no question that a true statement can "diminish" one's reputation.  Truths about infidelity have destroyed the reputations of politicians; truths about drug use have diminished the reputations of athletes; truths about fraud have discredited businesspeople.  "The truth hurts," as the adage goes, and there is no question that calling Mr. Merrell a liar in print was at least an attempt to diminish his reputation.  Ms. Renier argues that a jury must decide whether her statements actually diminished Mr. Merrell's reputation.  The Settlement Agreement, however, does not require successful disparagement or diminishment, it merely requires an "attempt[]."[5]

The parties present no extrinsic evidence that is inconsistent with the text of the Settlement Agreement.  Indeed, with the exception of Ms. Renier's reliance on a dictionary, <u>see</u> <u>supra</u> n.4, the parties put no extrinsic evidence before the court.  The court

---

[4]Ms. Renier cites a legal dictionary for the proposition that only falsehoods can "disparage." Opp'n at 9 n.7 (citing BLACK'S LAW DICTIONARY 503 (8th ed. 2004)); <u>but see</u> <u>id.</u> (defining "disparagement" as "castigating or detracting from [one's] reputation," especially, but not necessarily, "unfairly or untruthfully"). General purpose dictionaries do not predicate disparagement on falsity. <u>See, e.g.,</u> WEBSTER'S NEW WORLD DICTIONARY 395 (3d College ed. 1988) (defining "disparage" as "to lower in esteem; discredit" or "to speak slightingly of; show disrespect for; belittle").

[5]Although no party raises this issue, it is apparent from the Settlement Agreement that an "attempt" to diminish reputation does not require the specific intent to diminish reputation. The Settlement Agreement bars "conduct which attempts in any way" to diminish reputation. SA at 2 (emphasis added). Thus, a negligent attempt would suffice.

ORDER – 7

notes, however, that in light of their litigation history, the parties were certainly aware that they could sue for defamation for false statements that diminished their reputations. If they were content with the protections of existing defamation law, they had no reason to include a prohibition on diminishing or disparaging statements in the Settlement Agreement.  That the agreement contains such a bar is consistent with their intent to use the agreement to provide additional protection for their reputations.

In light of its interpretation of the Settlement Agreement, the court finds that Ms. Renier breached the agreement by publishing A Mind for Murder and the Posner article. The court now turns to Ms. Renier's defenses and counterclaims.

**B.   The Statute of Limitations Bars Mr. Merrell's Claims Based on the Posner Article.**

Mr. Merrell's own declaration is fatal to his claim for breach of the Settlement Agreement arising from Ms. Renier's publication of the Posner article.  A party must sue for breach of a written contract within six years of the breach.  RCW § 4.16.040(1).  The statute of limitations begins to run on the date of the breach, not the date on which the plaintiff discovers the breach.  North Coast Enters., Inc. v. Factoria P'ship, 974 P.2d 1257, 1260 (Wash. Ct. App. 1999).  Mr. Merrell's evidence shows that the last time Ms. Renier could have breached the Settlement Agreement was when she transferred the Posner article to a new website in "early 2000."  See Merrell Decl. at 5-6.  Mr. Merrell first asserted his claims regarding the Posner article in an August 2006 amendment of his complaint.  The statute of limitations bars those claims.

**C.   Ms. Renier Cannot Prevail on Her Counterclaims.**

Ms. Renier's counterclaims arise from Mr. Merrell's alleged breach of the Settlement Agreement in divulging the terms of the agreement to her publisher.  She relies on the clause requiring that "the terms of this Settlement Agreement shall be and will

ORDER – 8

always remain confidential." SA at 2. She ignores, however, that the confidentiality clause is subject to the parties' "right to seek enforcement of this Agreement in the event of its breach." Id. The agreement permits the parties to sue for damages arising from a breach of the Settlement Agreement, id., and necessarily permits them to take appropriate actions before filing suit. Based on the undisputed evidence before the court, the court finds that Mr. Merrell divulged the Settlement Agreement to Ms. Renier's publisher as part of an effort to remedy a breach. He therefore did not breach the Settlement Agreement.

Ms. Renier's remaining counterclaims are for tortious interference with her contractual relationship with her publisher and tortious interference with business expectancies arising from the authorship of A Mind for Murder. Under Washington law, Ms. Renier must establish five elements to prevail on either claim:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.

Leingang v. Pierce County Medical Bureau, 930 P.2d 288, 300 (Wash. 1997).

In this case, Ms. Renier cannot, as a matter of law, prove that Mr. Merrell interfered "for an improper purpose or used improper means." Id. Mr. Merrell's alleged "interference" was his communication with Ms. Renier's publisher regarding the Settlement Agreement. Mr. Merrell's purpose was to enforce the Settlement Agreement, and he used no improper means to further this purpose. The court therefore grants summary judgment against Ms. Renier's tortious interference counterclaims.

**D.   Mr. Merrell Has Evidence From Which a Jury Could Award Damages.**

Ms. Renier contends that Mr. Merrell cannot claim breach of the Settlement Agreement because he has no damages. Mr. Merrell admits that he has suffered no out-

ORDER – 9

of-pocket loss as a result of Ms. Renier's breach.  Hall Decl., Exs. 1, 2.  He nonetheless claims reputational harm, emotional distress, and attorneys' fees arising from Ms. Renier's breach.

For several reasons, the court finds that Mr. Merrell's alleged lack of pecuniary damages is not fatal to his breach of contract claim.  First, the court notes that it is not clear that provable damages are a necessary element of a breach of contract claim.  In Ford v. Trendwest Resorts, Inc., the court awarded nominal damages to an employee who had proved a breach of his at-will employment contract, but who could not prove actual damages.  43 P.3d 1223, 1229 (Wash. 2002).  The court noted that nominal damages are appropriate "where, from the nature of the case, some injury has been done, the amount of which the proofs fail entirely to show." Id. (quoting Gilmartin v. Stevens, 261 P.2d 73, 76 (Wash. 1953)); see also Shields v. DeVries, 422 P.2d 828, 832 (Wash. 1967) (awarding nominal damages); but see Ketchum v. Albertson Bulb Gardens, Inc., 252 P. 523, 525 (Wash. 1927) (in a claim for "damages suffered, mere proof that there was a breach of the contract, without more, did not warrant a verdict . . . even for nominal damages").  Even if more than nominal damages are a necessary, however, Ms. Renier fails to explain why Mr. Merrell's attorneys' fees do not suffice.  SA at 2 (providing for attorneys' fees for enforcing the Settlement Agreement).

Second, in addition to his damage claims, Mr. Merrell seeks an injunction to enforce the Settlement Agreement, and thus need not prove pecuniary damages.  A plaintiff need not prove financial loss to prevail in a suit to obtain specific enforcement of a contract.  For example, a suit to cure a breach of a property covenant does not require damages.  E.g., Day v. Santorsola, 76 P.3d 1190, 1203 (Wash. Ct. App. 2003); Piepkorn v. Adams, 10 P.3d 428, 434 (Wash. Ct. App. 2000).

ORDER – 10

Third, Mr. Merrell may be able to recover for emotional injury and non-pecuniary injury to his reputation.  Ms. Renier argues otherwise, citing Gagliardi v. Denny's Rests., Inc., 815 P.2d 1362 (Wash. 1991).  In that case, after an extensive consideration of Washington precedent, common law from other jurisdictions, and public policy, the court held that a plaintiff cannot recover emotional distress damages in a claim for breach of an employment contract.  Id. at 1374.  In reaching its holding, however, the Gagliardi court acknowledged that some contracts permit the recovery of emotional damages.  The court noted that while a breach of an employment contract might result in emotional distress, an employment contract's "primary purpose . . . is economic and not to secure the protection of personal interests."  Id. at 1370 (quoting Valentine v. General Am. Credit, Inc., 362 N.W.2d 628, 631 (Mich. 1984)).  Contracts generally protect pecuniary interests, and although pecuniary losses may cause emotional distress, this alone is insufficient to make emotional distress compensable.  Id. at 1372.  The Gagliardi court recognized, however, that courts can award emotional distress damages for breach of a "*contract*[] *uniquely intended to protect some personal interest or security* [that is] incapable of compensation by reference to the terms of the contract."  Id. at 1373 (emphasis added); see also id. at 1371-72 (noting that both the first and second Restatement of Contracts would permit recovery of emotional distress damages for breaches of some contracts).

The court finds that breach of the Settlement Agreement may give rise to compensable emotional damages.  Neither Gagliardi nor any other Washington authority of which the court is aware has considered how to determine when a contract protects a "personal interest or security" such that its breach gives rise to emotional damages.  In this case, the Settlement Agreement itself demonstrates that it protects personal, not merely pecuniary concerns.  The agreement bars attempts at "professional[]" and

ORDER – 11

"personal[]" disparagement.  SA at 2.  Although the agreement protects pecuniary interests, it also serves the parties desire "to no longer be involved in each other's lives in any way . . . ."  Id. at 1.  The agreement protects the parties' pecuniary freedom "to pursue their own careers," but also seeks to prevent contacts with the parties' "family, loved ones, and peer group . . . ."  Id. at 2.  A violation of these personal interests is likely to lead to a non-pecuniary loss.  This court is mindful of the Gagliardi court's concern that the availability of emotional distress damages could create "a jury issue on emotional distress in . . . nearly every breach of contract case."  Id. at 1374.  The contract in this action, however, is one that by its terms protects emotional interests that pecuniary damages will not compensate.

For the same reasons, breach of the Settlement Agreement may give rise to non-pecuniary reputational harm.  The agreement acknowledges that disparagement may give rise not only to out-of-pocket losses as a result of professional disparagement, but to non-pecuniary reputational injuries as well.  SA at 2.

In interpreting the contract to encompass some non-pecuniary damages, the court emphasizes that Mr. Merrell's non-pecuniary injuries, if any[6], are not necessarily compensable.  To prevail at trial, Mr. Merrell will have to prove not only that he suffered a non-pecuniary injury, but that the injury was the foreseeable result of violating an interest that the Settlement Agreement protects.  See Larsen v. Walton Plywood Co., 390 P.2d 677, 682 (Wash. 1964) (noting that determining if damages are within scope of contract is an issue of fact).

---

[6]The record before the court contains no evidence of Mr. Merrell's emotional distress or non-pecuniary reputational injury.  Because Ms. Renier based her request for summary judgment solely on his lack of evidence of pecuniary loss, Mr. Merrell had no obligation, at this stage, to present evidence of non-pecuniary damages.

ORDER – 12

**E.     The First Amendment Does Not Limit Mr. Merrell's Contract Remedies.**

Ms. Renier contends that the First Amendment shelters her from liability under the Settlement Agreement.  For several reasons, the court finds that the First Amendment does not limit Mr. Merrell's remedies in this action, but that it may require him to prove the falsity of Ms. Renier's statements before recovering damages.

**1.     State Action**

As Ms. Renier acknowledges, the First Amendment has no application in this action unless she can point to "state action" that infringes her freedom of speech.  Here, the only potential state action is the court's application of law in a manner that limits or penalizes Ms. Renier's speech.  Court action, however, is not always state action.  For example, when a court merely "approv[es] of or acquiesce[s] in the initiatives of a private party," there is no state action.  Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982).  On the other hand, courts find state action in the enforcement of private promises where the application of state law "creates obligations never explicitly assumed by the parties." Cohen v. Cowles Media Co., 501 U.S. 663, 668 (1991).

The Supreme Court's discussion in Cohen sheds substantial light on how to determine if enforcement of a private promise is state action.  In that case, newspaper reporters promised to protect the identity of a source, but breached their promises.  Id. at 665.  The state supreme court held that the reporters' promises did not create a contract, but found that the source could enforce the promises with a promissory estoppel claim. Id. at 666-67.  The Supreme Court granted certiorari solely to consider the First Amendment implications of the use of promissory estoppel.  Id. at 667.  The Court held

ORDER – 13

that "promissory estoppel, in the absence of contract, creates obligations never explicitly assumed by the parties" to the promise. Id. at 668. It thus found state action.[7]

Under Cohen, Mr. Merrell's request for disgorgement of Ms. Renier's profits necessarily invokes state action. Mr. Merrell concedes, as he must, that the Settlement Agreement does not allow him to recover those profits. Contract damages serve merely to make the party whole. Mr. Merrell's claim for equitable relief asks the court to impose on Ms. Renier an obligation that she never voluntarily assumed. This is sufficient under Cohen to constitute "state action." 501 U.S. at 668.

Mr. Merrell's breach of contract claim presents a more complex state action question. Typically, the government is "responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum, 457 U.S. at 1004. Here, Ms. Renier and Mr. Merrell explicitly assumed the obligation not to attempt to diminish each other's reputations, and did so without government involvement. Some courts facing analogous contract claims have found no state action. In United Egg Producers v. Standard Brands, Inc., 44 F.3d 940, 942-43 (6th Cir. 1995), the court found no state action in the plaintiff's suit to enforce a settlement agreement barring disparagement of the parties' products. Similarly, in State v. Noah, 103 Wn. App. 29, 37, 9 P.3d 858 (Wash. Ct. App. 2000), the court considered a settlement agreement prohibiting the defendant from picketing outside a counselor's office. The court rejected

---

[7]The Court's focus in Cohen on whether state law imposes obligations that private parties have not assumed is consistent with its landmark decision in Shelley v. Kramer, 334 U.S. 1 (1948). In Shelley, the Court found state action because the enforcement of racially restrictive land covenants would impose burdens on persons (prospective purchasers of property subject to the covenants) who were not parties to the covenants. Id. at 19.

ORDER – 14

the defendant's First Amendment challenge, finding no state action.[8] Id. at 50.  Other jurists have found state action under similar circumstances.  See Int'l Union v. Dana Corp., 679 F.2d 634, 650 ("It is clear to me that impermissible state action occurs when courts marshal their injunctive powers to enforce private agreements that operate as prior restraints on speech.") (Martin, J., dissenting), vacated by en banc court, 697 F.2d 718 (6th Cir. 1983)).

The court defers its resolution of the state action question that Mr. Merrell's contract claim raises.  For now, the court assumes that enforcing the Settlement Agreement would constitute state action.  As the court explains below, this assumption makes to the resolution of most, but not all, of the issues in this case.  See Shoen v. Shoen, 5 F.3d 1289, 1299 n.4 (9th Cir. 1993) (directing courts to avoid unsettled questions of constitutional law where there is an alternate basis for its decision).

## 2.   Mr. Merrell's Contractual Remedies Do Not Violate The First Amendment.

Ms. Renier claims that enforcing the Settlement Agreement would run afoul of the First Amendment limitations on state law remedies for reputation damages first enunciated in New York Times v. Sullivan, 376 U.S. 254 (1964).  Ms. Renier contends that New York Times requires Mr. Merrell to prove the falsity of her statements and to demonstrate that she made them with "actual malice."  See id. at 279-280 (explaining that "actual malice" is "knowledge that [the statement] was false or . . . reckless disregard of whether it was false").

New York Times and its progeny impose a complex array of restrictions on state remedies for reputation damage.  The complexity reflects the Supreme Court's

---

[8]The state court's application of the federal "state action" doctrine in Noah is entitled to deference, but does not bind a federal court.  See Watson v. Estelle, 886 F.2d 1093, 1095 (9th Cir. 1989).

ORDER – 15

"[struggle] . . . to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 768 (1986).  As Justice O'Connor wrote for the majority in Hepps, "two forces" are critical in determining the extent to which the First Amendment "reshap[es]" common law remedies:

> The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern.

Id. at 775.  The First Amendment's "reshaping" force reaches its zenith when a public figure plaintiff seeks damages based on speech about matters of public concern.  Id.  It is at its nadir "[w]hen the speech is of exclusively private concern and the plaintiff is a private figure."  Id.

Mr. Merrell is a private figure.  In all but "exceedingly rare" cases, public figures are either persons in "positions of such persuasive power and influence that they are deemed public figures for all purposes" or persons who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution . . . ."  Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).  Although there is evidence that Mr. Merrell placed himself at the center of a controversy over Ms. Renier's paranormal powers, it is not a "public controversy."  The Court has cautioned against "equat[ing] 'public controversy' with all controversies of interest to the public."  Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) (citing Gertz, 418 U.S. at 345).  In Firestone, the Court held that a litigant in a high-profile divorce proceeding was not a public figure "even though the marital difficulties of extremely wealthy individuals may be of interest to some portion of the reading public."  Id.  In the instant case, even if Ms. Renier's

ORDER – 16

psychic capabilities are of interest to some, they form no part of a "public controversy."[9] This is so even though her dispute with Mr. Merrell made its way through several courts. See id. at 454-55 (noting that a judicial proceeding is not necessarily a public controversy).

Because Mr. Merrell is a private figure, Gertz defines the extent to which the First Amendment limits his common law remedies. Under Gertz, "so long as they do not impose liability without fault," states may define the standard of liability for speech that harms a private figure. 418 U.S. at 347. Barring proof of actual malice, however, a private figure may recover only for "actual injury." Id. at 349.

The First Amendment's restrictions on Mr. Merrell's contract remedies are coextensive with the restrictions of Washington common law. First, there is no danger that Mr. Merrell's claims violate the Gertz prohibition on liability without fault. Although the Settlement Agreement is silent as to the possibility of liability without fault, the record before the court shows that it is impossible that Ms. Renier breached the agreement in this case without some level of fault. She knew or should have known of the agreement, and breached it nonetheless. Second, there is no danger that the court will impose liability for damages that are not "actual injuries" under Gertz. As the Gertz court explained, "actual injury" includes not only "out-of-pocket loss," but actual harm to reputation, "personal humiliation, and mental anguish and suffering." 418 U.S. at 350. By contrast, presumed damages and punitive damages do not compensate for actual injury. See id. at 349-50. There is no danger that Mr. Merrell will recover such damages,

---

[9]Even if the court found that the 1985 Oregon litigation was a "public controversy," it is highly unlikely that it has remained a public controversy over the twenty years between its conclusion and the publication of A Mind for Murder. See Fitzgerald v. Penthouse Int'l, Ltd., 691 F.2d 666, 668 (4th Cir. 1982) (considering whether "plaintiff retained public figure status at the time of the alleged defamation").

ORDER – 17

however, because neither presumed damages[10] nor punitive damages are available in a breach of contract action.

The authority that Ms. Renier cites in support of greater First Amendment restrictions is distinguishable.  She mistakenly relies on Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988).  There, the Court considered a state law claim for intentional infliction of emotional distress arising from a mock advertisement.  This court cannot describe the advertisement more concisely and evocatively than Justice Rehnquist:

> [Defendant] drafted an alleged 'interview' with [plaintiff] in which he states that his 'first time' was during a drunken incestuous rendezvous with his mother in an outhouse.  [Defendant's] parody portrays respondent and his mother as drunk and immoral, and suggests that respondent is a hypocrite who preaches only when he is drunk.

Id. at 48.  The Court held that the plaintiff could not recover emotional damages without proving "actual malice."  Id. at 56.  The plaintiff, however, was Jerry Falwell, a "a nationally known minister who has been active as a commentator on politics and public affairs."  Id. at 47.  He was thus a public figure.  Id. at 57.  Ms. Renier provides no authority for extending the Hustler Magazine Court's "conclu[sion] that *public figures and public officials* may not recover for the tort of intentional infliction of emotional distress" to Mr. Merrell's claims as a private figure plaintiff.  Id. at 56 (emphasis added).

Cohen is also inapposite.  There, the court declined to apply any First Amendment restrictions on the plaintiff's state law remedies because he was "not seeking damages for injury to his reputation or state of mind."  Cohen, 501 U.S. at 671 (distinguishing Hustler Magazine).  Here, Mr. Merrell claims both reputational and emotional injury.

---

[10]The court notes that "presumed damages" under Gertz bear no resemblance to nominal damages under contract law.  418 U.S. at 349 (explaining that presumed damages are "*substantial sums* as compensation for supposed damage") (emphasis added).

ORDER – 18

### 3.     The First Amendment May Require Mr. Merrell to Prove that Ms. Renier's Statements Are False.

Although the First Amendment does not limit Mr. Merrell's breach of contract remedies, it may require him to prove Ms. Renier's statements false before he can recover.  In <u>Hepps</u> the Court held that a private plaintiff who seeks damages arising from speech must prove that the speech is false.  475 U.S. at 776.  To decide whether <u>Hepps</u> applies to Ms. Renier, the court must consider two issues:  whether Ms. Renier has waived her right to publish true statements about Mr. Merrell, and whether Ms. Renier's statements are of public concern.

### a.     Waiver

Although the First Amendment typically protects the right to speak the truth, a person can waive that protection.  <u>Leonard v. Clark</u>, 12 F.3d 885, 889 (9th Cir. 1993) (citing <u>D.H. Overmyer Co. v. Frick Co.</u>, 405 U.S. 174, 185, 187 (1972)).  A court will enforce a waiver of First Amendment rights "upon clear and convincing evidence that the waiver is knowing, voluntary, and intelligent."  <u>Id.</u>  If there is a clear, voluntary, and intelligent waiver, the court must also consider whether public policy demands that the court not enforce the waiver.  <u>Id.</u> (citing <u>Davies v. Grossmont Union High Sch. Dist.</u>, 930 F.2d 1390, 1394 (9th Cir. 1991)).

The court cannot decide, on the record before it, whether Ms. Renier waived her right to speak the truth.  The court has already interpreted the Settlement Agreement to prohibit both parties from making statements that attempt to "diminish and/or disparage the other's reputation," SA at 2, regardless of the truth of those statements.  <u>See</u> <u>supra</u> Part III.A.2.  This conclusion, however, is a matter of Washington contract law.  Federal law requires a different inquiry, one which places a heavy burden on the party claiming waiver.  The court must hear all evidence bearing on waiver, and may not find a

ORDER – 19

relinquishment of First Amendment rights without a "clear and compelling" showing that the party knew what it was waiving. <u>Curtis Pub. Co. v. Butts</u>, 388 U.S. 130, 145 (1967); <u>see also</u> <u>Brookhart v. Janis</u>, 384 U.S. 1, 4 n.4 (1966) ("When constitutional rights turn on the resolution of a factual dispute [a court is] duty bound to make an independent examination of the evidence in the record.").

It is in the distinction between Washington contract law and the federal law of constitutional waiver that the court finds the resolution of the remaining "state action" question before it. Under Washington contract law, Ms. Renier abandoned her right to speak the truth about Mr. Merrell. Under federal law, a jury hearing this dispute might conclude that Mr. Merrell cannot prove by clear and convincing evidence that Ms. Renier knowingly, voluntarily, and intelligently waived her First Amendment rights. If the court were to permit contract law to answer the waiver question, it would place an obligation – a waiver of constitutional rights – on Ms. Renier when she did not necessarily "explicitly assume[]" that obligation. <u>Cohen</u>, 501 U.S. at 668. If it is determined that Ms. Renier waived her right to speak the truth, then there will be no state action in the court's enforcement of her waiver.

### b. Absent Waiver, Mr. Merrell Might Have to Prove the Falsity of Ms. Renier's Statements.

If Ms. Renier did not waive her right to speak truthfully, the First Amendment may nonetheless permit the court to impose liability regardless of the truth of her statements. The Settlement Agreement itself imposes liability without regard to truth; but <u>Hepps</u> does not permit this result for speech that is of "public concern."[11] 475 U.S. at 777. Whether

---

[11]On its face, the <u>Hepps</u> holding applies only when "a plaintiff seeks damages against a *media defendant* for speech of public concern." 475 U.S. at 777 (emphasis added). A majority of the Supreme Court, however, has stated that the distinction between media defendants and non-media defendants is irrelevant. <u>See</u> <u>Dun & Bradstreet</u>, 472 U.S. 749, 783-

ORDER – 20

speech is of public or private concern depends on its "content, form, and context . . . as revealed by the whole record." Dun & Bradstreet, 472 U.S. 749, 761 (1985) (quoting Connick v. Meyers, 461 U.S. 138, 147-48 (1983)).  The Dun & Bradstreet Court borrowed this definition from the "related context" of First Amendment restrictions on public employees.  Id.  In that context, the Ninth Circuit explains that speech of "public concern" is not necessarily "of global importance or vital to the survival of Western civilization."  Roe v. San Francisco, 109 F.3d 578, 585 (9th Cir. 1997) (internal quotation omitted).  Instead, speech of "public concern" merely "concern[s] matters in which even a relatively small segment of the general public might be interested."  Id.

The court cannot determine, on the record before it, whether Ms. Renier's comments about Mr. Merrell are of public concern.  Although the court (not a jury) must decide whether the speech is of "public concern," Connick, 461 U.S. at 148 n.7, the record does not permit an assessment of the public interest in Ms. Renier's statements.  Although her dispute with Mr. Merrell is a private one, a publisher's decision to publish a book airing the dispute is an indication that at least a "relatively small segment of the general public" is interested in it.  Roe, 109 F.3d at 585 (noting that media publication of speech is evidence of public concern).  The court cannot appropriately evaluate the content, form, and content of Ms. Renier's statements at this stage.

**F.**     **The Court Declines to Award Mr. Merrell Disgorgement of Ms. Renier's Profits.**

The court turns next to Mr. Merrell's efforts to obtain Ms. Renier's profits from A Mind for Murder.  As the court has previously noted, disgorgement is an equitable

84 ("[A]t least six Members of this Court . . . agree today that . . . the rights of the institutional media are no greater and no less than those enjoyed by other individuals or organizations engaged in the same activities.") (Brennan, J., dissenting); id. at 773 ("[T]he First Amendment gives no more protection to the press in defamation suits than it does to others exercising their freedom of speech.") (Powell, J., concurring).

ORDER – 21

remedy.  In matters of equity, court has broad discretion to fashion an appropriate

remedy.  Rutcosky v. Tracy, 574 P.2d 382, 385 (Wash. 1978).  Here, the court declines to

award any remedy.  Ms. Renier's objectionable statements constitute a tiny fraction of

two chapters of A Mind for Murder.  There is no indication that the statements made any

difference in the marketability or popularity of the book.  Indeed, the court finds that

excising the objectionable statements would make virtually no difference in the impact of

the chapters.  At most, the court could attribute a slim margin of any profits from A Mind

for Murder to Ms. Renier's breach of the Settlement Agreement.  Under these

circumstances, the court finds that Mr. Merrell's breach of contract remedies are

sufficient compensation, and declines to exercise its equitable authority.[12]

**G.     The Court Denies Mr. Merrell's Motion to Compel Ms. Renier's Deposition.**

Finally, the court emerges from the First Amendment thicket to deny Mr. Merrell's

motion to compel Ms. Renier to appear for deposition.  This motion is a comedy of

errors.  Under the operative case management schedule (Dkt. # 14), parties were to file

discovery motions no later than September 11, 2006.  Mr. Merrell filed his motion on

October 5.  Although he moved to compel Ms. Renier to appear for deposition, his

counsel neglected to serve a notice of deposition as Fed. R. Civ. P. 30 requires.  When

Ms. Renier's counsel pointed out his mistake the next day, counsel served a belated

notice of deposition requiring Ms. Renier to appear on October 25.  He neglected to note

that discovery in this matter closed on October 10.  Any one of these errors provides the

court with a basis to deny Mr. Merrell's motion.

---

[12]Although the court declines to exercise its equitable power for other reasons, it notes
that the discretionary exercise of equitable power to fashion a remedy for "wrongful" speech
raises the possibility that a court's judgment upon the content or viewpoint of the speech
would influence the remedy it chooses.  The court declines, at least in this action, to wade into
such murky waters.

ORDER – 22

# IV.  CONCLUSION

For the reasons stated above, the court GRANTS Mr. Merrell's summary judgment motion (Dkt. # 23) in part and DENIES it in part.  The court GRANTS Ms. Renier's cross-motion for summary judgment in part and DENIES it in part.  The court DENIES Mr. Merrell's motion to compel (Dkt. # 28).

The court summarizes this order as follows:

1)   Mr. Merrell can recover no more than nominal damages for pecuniary injury, as Ms. Renier demonstrated that he has no evidence of out-of-pocket loss.

2)   Unless he proves that Ms. Renier's remarks were not of public concern, Mr. Merrell cannot recover for non-pecuniary injury (non-pecuniary reputational loss and emotional distress) without proving that Ms. Renier's statements were false.

3)   The court will not award Mr. Merrell disgorgement of Ms. Renier's profits from <u>A Mind for Murder</u>.

4)   Mr. Merrell has no claim arising from the publication of the Posner article.

5)   Ms. Renier has no triable counterclaims.

Dated this 16th day of November, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 23